Good morning and may it please the court. My name is Dan Donovan. I'm from Great Falls, Montana. I'm counsel for the defendant-appellant Mark Culkin. I was not trial counsel. I need to make two main points here today. First is that there is a Fourth Amendment protection for a teepee. And a teepee certainly deserves more protection than a tent because more activity can go on in a teepee than in a tent. And secondly, that the expectation of privacy of my client in the teepee here is independent of and separate from the right of privacy in his house. So what I'm saying is that's two different things, although there is a curtilage argument here that does connect the two. In three cases, the Ninth Circuit has recognized the right of privacy in tents. In LaDuke, there was a tent on private property. In Gooch, there was a tent on a public campground. And in Sandoval, there was a tent camped illegally on government land. Mr. Culkin's teepee was erected on his own property and therefore deserves the same, if not more, protection. Well, here, in terms of the motion to suppress, am I correct that the evidence that the appellant wants to suppress was found in the house, not in the teepee? That's correct. Okay. So if they had a right to be outside the teepee, and from there they observed the house in a condition that led them to enter the house, why do we have to focus on the expectation of privacy in the teepee? Because at least in my initial thinking about the case, I was heading past that and asking myself, if they had a right to investigate and be on the grounds outside the teepee, and then they saw the condition of the house, did they have a right to enter the house? But you're starting off with the teepee issue, so perhaps I'm missing something. Well, I'm not arguing, and I don't think I can argue that they had no right to come on the land and be around the teepee. But what happened, they went beyond that, the officers did, and they opened, the teepee was closed, they opened the teepee, they shined their flashlights in the teepee and looked in, and they actually went inside the teepee. Okay, so if you had a civil rights action for your clients for damages for their entry into the teepee, then I understand that, why that would be pertinent. But here we're dealing with their decision to enter the house and the evidence they then found in plain view in the house. So why does it matter whether they entered the teepee wrongfully? From your question, Your Honor, it will rise or fall on this one point. The officers were told it turned out falsely or incorrectly that there had been a struggle inside the teepee and that my client had been shot there, and they found no signs of struggle inside the teepee. So it wasn't until that point that they decided to go to the house. And so basically what I'm saying, because there was initial illegal intrusion in the teepee, everything they did after that, because of what they discovered in the teepee, no sign of struggle is true of the poisonous tree. So we have to conclude for you to succeed that the officers would not have gone to the house at all if they had not looked inside the teepee and found no signs of struggle. Well, I don't know. Possibly. I really don't know the answer to that. The lights were on at the house, so an argument could be made they would have gone to the house anyway. Well, if they would, then you're out of court, aren't you? Right. But the fact is they went to the teepee first, and if they hadn't gone to the teepee first, went directly to the house, I couldn't be arguing this point, obviously. Were they told that the shooting took place in the teepee and there was nobody who was hurt still in the teepee and there was no reason to go in the teepee? As my understanding, they weren't given that much detail. They were only informed about my client who was shot in the neck and that it had occurred in the teepee area. So wouldn't it be reasonable for them to search the teepees to see if there were any other victims or indeed perhaps a perpetrator inside? Well, I look at it as there was first there would be no emergency doctrine. There was no reason to believe, as I understand it, in the emergency doctrine that there was somebody still inside the teepee who could be hurt. And then I don't even if they had probable cause to look in the teepee for evidence of the shooting or whatever, they still didn't have a warrant to go in there or permission to go in there. Well, suppose that the perpetrator were hiding in the teepee and they were looking for the perpetrator. Wouldn't they, for reasons of officer safety, have to check out whether he was still in there? That's certainly an argument, Your Honor, but I think that's speculation. And also it's pretty clear that these officers arrived at least around two hours after the incident happened, so it would be unlikely that a perpetrator would still be there. Certainly that was one of the arguments the defense made concerning the entry of the house on suspicion of there being a burglary. Not the defense made, the prosecution made. Right. I'm sorry. But in the teepee cases, in the Sandoval case and the Gooch case, like here, both tents were closed and the interior of both tents could not be seen from the outside. And like in the LeDuc case, the officers here did a search by a flashlight and actually trespassed into the teepee. The government argues that there's evidence that, and because there's evidence supposedly that Mr. Culkin actually slept in his bedroom in the house and there's no evidence that he slept in the tent, that that somehow extinguishes a right of privacy in the teepee. But I'm arguing that's not determinative. I think there's a right of privacy, again, in the teepee independent of the house. And the question really is, if you look at the curtilage issues, the four curtilage issues from the Dunn case, one of them is the uses of the facility or the teepee in this case, and there really is no evidence on that in this case. So I'm just making suggestions. But the Oliver case said you look to whether there can be intimate activity concerning the sanctity of man's life or the privacy of life in the place other than the house. And clearly, a teepee can be a place for meeting, can be a place for gathering, can be a place for cooking, can be a place for eating, and, in fact, can be a place for building a fire, and often is, and unlike a tent. I mean, obviously, if you go camping in Montana, I know there's in the winter or in the fall and winter when it's cold that we have people in tents that put stoves to keep themselves warm, but I think that's an exception. Normally people sleep in tents, but they carry out their other daily activities, cooking, whatever, gathering outside the tent around the campfire. And in a teepee, obviously, those activities can occur within a teepee. Mr. Donovan, if you want to make rebuttal argument, you've got to pause before all that time's gone. All right, I'll reserve the remainder. Thank you very much. It's up to you, sir. Thank you. Now, we have the Assistant United States Attorney, Joshua Vandewettering, on the video. Please proceed, sir. Thank you very much, Your Honor. I am Josh Vandewettering from the United States Attorney's Office in Missoula, Montana. Because of the court's tight time schedule, I will not belabor the issues we've raised in the brief unless the court has questions about them. But I would like to make a couple of points about what Mr. Donovan has said so far and what some of the court's questions are. With respect to whether or not the officers would have gone to the house anyway, I think it's clear under the law that they could have gone to the house anyway. And, of course, at that point would have seen the broken-down door and all the other evidence that would have naturally led them inside. With respect to whether or not they would have, I would refer the court to page 151 of the excerpts of record, which contains transcripts from the suppression hearing. There, it's very clear that the undersheriff is testifying on what are listed as pages 5 through 8 of the transcript there, that they saw no evidence outside the tent of any kind of struggle or even that there had been a number of people there. The officers described the soil outside the – or, excuse me, the teepee – described the soil outside the teepee to being sandy, having only a couple of sets of footprints, and that it was really very – the soil was very smooth and there was no evidence of anything, even a lot of people being there, and they described it as nice and tidy with nothing undisturbed. I think it's safe to assume from that that the officers would indeed have proceeded to the house because the undersheriff immediately afterwards says things weren't matching up, they had told us a lie, and the shooting happened somewhere else. So they clearly were going to go look elsewhere. I would not try to – Excuse me, when you – Judge Tanby – when you get to the house, what is the emergency that authorizes them to go inside? I mean, it's been hours. It has been hours, Your Honor, but I think because of the very reasons the undersheriff is describing there, things aren't matching up. They don't know what's going on. What they do know is that apparently nothing's happened in the teepee. There's been some kind of extreme violence in the house. The people who have reported what is clearly a shooting have not told the truth. There may be other victims. The people who have reported the shooting perhaps are perpetrators of something else. I think they really have a responsibility at that point to go in to see if there are other victims or other perpetrators inside. It's because of that confusion, I think, creates the exigency. Perhaps if the situation were different and they found the scene exactly as the defendants in this case had described and everything did match up, perhaps there would not be an exigency. But I think the fact that it doesn't match up creates that exigency. As I prepared for this case, I wondered with respect to that connection. Was there some evidence of an observation of a bloody towel from outside the house? Yes, there are. And that was through the window. All the lights in the house were on, and it was easy to see inside. And that, of course, is part of what leads the officers to that exigency. They can see there's been violence inside the house, and because they don't know what's happened, I think the exigency requires them to go in. With respect to the connection between the tent and the house, I can't decide, and thinking of the doctrine of fruit of the poisonous tree, if we don't have poison at the tent or if there's no fruit in this tree. But it's clear that there's nothing in the tent that necessarily leads them, other than the absence of what they're expecting to be there, that leads them to the house. I think it's inevitable that these officers are going to be at the house finding what they find inevitably. And that is all I have with respect to that issue. I won't add anything to what we have in our briefs with respect to the restitution issue unless the court has other questions. Thank you. No questions here, so we thank you for your argument. Okay, Mr. Donovan. I just have two points to make, if I may. First, I don't believe until today that the government has argued inevitable discovery, which I don't think is applicable. And secondly, I think the difference is that, from what Mr. Van de Wettering says, I wouldn't be arguing this if the officers had gone to the tent, looked around the outside, and then gone to the house. But the fact of the matter is they opened the tent. They looked in with a flashlight there. I mean, sorry, the teepee. They opened the teepee. They looked in with a flashlight. They entered the teepee, and it wasn't after that point that they went to the house. And that's a fact, several facts in the record that distinguish Mr. Van de Wettering's argument. Do we have any cases that say that the absence of evidence can be proof of the poison tree? I sure don't, Your Honor. I'm just saying the fact that they found absence of evidence led them to go to the house. Thank you very much. Very good. Thank you, sir. United States v. Kocan shall be submitted, and we thank counsel for their arguments. The next case on our argument calendar is United States v. Duran Mercado. This case is set for 10 minutes per side. For the defendant appellant, we have Mr. Kenneth Sharaga.
judges: Canby, Gould, Bea